In August, 1818, the Simpsons executed a deed purporting to' convey to Hawkins and Cochran, five hundred and thirty acres of land; two hundred and fifty of which ,1,1 i- , , , , , . they held, according to the deed, under the claim of Howárd, and the remaining two hundred and eighty acres under a deed executed by William Steele, as attor. ney in fact for John Adams, to them. The deed from the Simpsons to Hawkins and Cochran, contains a clause. of general warranty.
Hawkins and Cochran purchased the land at fifteen dollars per acre; paid a large sum in hand, and gave their notes for the balance. Judgments were obtained on some of these notes ; to restrain the collection of which Hawkins &c. filed their bill. An injunction was awarded. The equity relied on consists in an alleged defect of title, and an inability on the part of the plaintiffs in error, to remunerate the defendants, in case the land should be taken from them after the payment of the money.
The court rescinded the contract, and decreed that the Simpsons should repay the purchase money received by them, with interest; and likewise pay for the lasting and valuable improvements made upon the premises since *304 the sale, subject to deductions for rent and waste. The writ of error is prosecuted to reverse this decree.
Commissioners were appointed to settle the accounts. ^ieY reported a large balance against the Simpsons. The report was confirmed by the court ; and a final decree entered, authorizing the defendants to hold possession of the lands until the money was paid, and providing for a sale of the land, if the money was not paid by a given day, and appointing a commissioner to carry the decree into effect by making the sale upon the nonpayment of the money. The commissioner was left to decide whether the money was paid on the day or not. He made sale of the land, at public auction, on the 8th of December, 1828 ; having first caused the land to be valued, as though the sale has been conducted under a. fieri facias. Rigg purchased it, at the price of one hundred dollars. The commissioner reported his proceedings to court; they were confirmed; and after crediting the hundred dollars made by the sale, a balance was found against the plaintiffs in, error, amounting to three thous- and four hundred and twenty nine dollars, forty seven and a half cents; which the court directed them to pay, with interest at the rate of six per centum per annum, from the 11th of August, 1818, together with aH costs ; and authorized execution to issue therefor. After this, an execution was taken out, upon the decree, and levied on the equity of redemption, which the plaintiffs in error claimed in the land. Their equity of redemption was sold for one hundred dollars, and purchased by Rigg.
it seems from the evidence in the cause, that the Simpsons, or one of them, settled on that part of the land covered by the claim of Howard, as far back as February, 1796. So that there was more than twenty years continued possession, from the date of that settlement up to the time possession was delivered to Hawkins and Cochran. The possession of the Simpsons during that period, within the limits of Howard’s claim, was adverse to the claim of Adams, of twenty thousand acres. It does not appear, that a writ of right would avail any thing in favor of the representatives of Adams. An action of ejectment could not dispossess the Simpsons, or their *305 vendees, to the extent of the two hundred and fifty acres held by them under Howard’s claim.
A contract for unafífected^by fraud, cannot be chancery’ after it has been car-by^^onvey-a|“e. [Seethe Nicholas,post!
entitied^dam-ages for a breach ofarovenantof seizm’ and the grantor msol-vent, the grantee.may obtain restrain the coL Unpaid portion ofthe purchase naltyhave it set off against the further on this point, at p. 309, and the concurrent opinion of Judge Nicholas,
jf the grantee in possession loses part of the land, : but it is not he may recover, on the warranty, damages commensurate with the loss cause for rescinding the whole contract.
Regarding the protection which time had thrown around the Simpsons, perceiving no actual fraud on their part in the contract with Hawkins and Cochran, and seeing that the contract has -been fully éxecuted by a formal conveyance, with warranty of title against all the world, which warranty has not been broken by an eviction from the premises, and for ought that appears to us, never will be, we cannot concur with the circuit court in a total rescission of the contract.
Indeed, where contracts are executed by conveyances, we are of opinion, that there can be no rescission of a contract in any case, unless.it has been tainted by actual fraud. If the warranty of title has been broken,.so as to entitle the vendee to .damages, or if the vendee be entitled to damages upon a covenant of seizin, he may apply to the chancellor, where the vendor is insolvent, to set-off those damages against the unpaid portion of the purchase money. The ground upon which the chancellor interferes in such cases, is the prevention of the irreparable mischief which otherwise might result from the insolvency. He ought not to'act upon the principle of rescinding- the contract. ' On the contrary, he should af- ° i-i nrm the contract, and secure to the party such damages as he might be entitled to, for a partial or total violation thereof by the obligor. If a deed of conveyance be executed, for any quantity of land, and the vendee is put into possession thereafter, in case he loses half or three fourths of the land, the law only authorizes a recovery, upon the warranty, of damages commensurate with the loss. The chancellor must follow the law, and not lay hold of sucha partial loss, and require the vendor to . iii . ,, . take back the portion 01 the land saved, and return the purchase money for that, under the idea of rescinding
-The fact, that Howard’s claims were not carried into grant at the date of the deed from the Simpsons to Haw *306 kins and Cochran, cannot operate against the foregoing view of the subject. It is enough that the Simpsons, or one of them, entered upon the land claiming the same adversely to Adams, whose title, now, is the cause of | j i r i ■ to the deiendants in error.
Twenty years adverse possession may be relied on, without a grant or conveyance.
A covenant of warranty is not broken until an eviction has taken place.
An administrator, with tlie will annexed, may exercise all the powers intended to be conferred on the executor by the will.
But administration, with the will annexed, granted in another state, 4°es not authorize such adm’r to convey land in this state, unless he is also, appointedbythe proper ct. here: his deed would pass no title. — ■ See the opinions of the Ch. Jus. and Judge Nicholas, (both -concuringlposi.
It is not necessary that the possessor of land should claim under a patent, in order to avail himself of the limitation founded on twenty years continued, adverse possession. The surveys of Howard were made as early as 1792. This fact, connected with other circumstances, justifies the inference, that .the Simpsons entered upon and claimed a particular quantity, susceptible of identification by a marked boundary. It does not appear, but that Howard’s claims may yet be carried into grant. They may be saved from forfeiture by the disabilities provided for in the. statute. But, Jiowever these things mav be, it is certain that the covenant of warranty made by the Simpsons, has not been broken; and for any thing appearing to us, it is not probable that it ever will he, so far as it relates to tbe two hundred and fifty acres claimed under Howard by the Simpsons; to that extent, therefore, the decree cannot be sustained.
In relation to the two hundred and eighty acres conveyed to Hawkins and Cochran, we have experienced more difficulty. This parcel the Simpsons claimed under a deed executed in the name of John Adams, administrator, with the will annexed, of Richard Adams, by William Steele, his attorney in fact. We are of opinion that this deed confers no title upon the Simpsons. Conceding that the administrator with the will annexed, may do all which the executor refusing to qualify might have performed upon his qualifying, under the authority conferred by the act of 1810, (4 Littell's Laws, 204,) as was determined by this court in the case pf Jackson vs. Jeffries, 1 Mar. 88, still we apprehend that the person appointed administrator, with the will annexed, in another state, where the testator died, and where his will may have been first recorded, cannot exercise the power and fulfil the duties contemplated by the act. of 1810, in relation to real estate situated in Kentucky, unless he shall be appointed by the'proper court in-this state. In *307 deed, we look upon the case of Jackson vs. Jeffries, as settling the point. In that case, as may be seen by the petition for a rehearing, it was contended that the appointment of an administrator, with the will annexed, in Virginia, conferred on the admistrator so appointed the power to sell and convey, under the act of 1810, if the true construction of that act conferred any such authority upon an administrator in any case ; and consequently, that the acts of the subsequently appointed administrator, with the will annexed, in Kentucky,were void. This idea'was rejected by the court, and the acts of the administrator appointed in this state supported. Two points seem to have been settled in that case : first, that executors must obtain from the proper court in this state, letters testamentary, before they can administer the estate situated here, in cases where the will was made and admitted to record in another country ; and second, that executors by taking upon themselves the administration.of the will in a foreign country, do not preclude the courts of this state from granting administration, with the will annexed, with a view to reach the property situated here. It is a settled fundamental doctrine, that the lands of every state can only pass from one to another according to the laws of the state' where they are situated. It results that an administrator, with the will annexed, to be able to sell lands situated in Kentucky, must receive his appointment from a court in this state. Now the will of Richard Adams does not appear to have been recorded in any office of this state ; nor does it appear that any court of this state ever appointed an administrator, with the will annexed. John Adams received his appointment, as administrator, from a court in Virginia, in the year 1800, after all the executors named in the will had refused to qualify. Without enquiring into the extent and validity of the pcfwer of William Steele, as derived from John Adams, we have reached the conclusion, that the deed executed in the name of Adams, by Steele, conferred no title on the Simpsons; because Adams was not appointed administrator, with the will annexed, by the proper tri.. bunal in this state.
If land be sold, without fraud or misrepresentation, the conveyance executed,and the ven-dee in possession, and it af-terwards turns out that the vendor was in’ fact destituteoftitle: yet while the vendee, remains possession the land,he cannot have- a rescission for the failure of title. [Judge Nicholas of a different opinion, posi.J ín undisturbed ■
As to the two hundred and eighty acres of land, therefore, sold by the Simpsons to Hawkins and Cochran, they have no title whatever ; and inasmuch as the Simpsons and those claiming under them, have not had twenty years continued adverse possession, the representatives of Richard Adams, deceased, who is recognised on all sides, as the original proprietor, have it in their power to evict Hawkins and Cochran, their heirs, and vendees, from the said two hundred and eighty acres of land. But as yet no eviction has taken place, and the question arises, whether a possibility, or even a probability, that an eviction will hereafter' take place, coupled with the insolvency of the Simpsons, is sufficient to justify the defendants in error in withholding the payment of the balance 0f t|le purchase money. We think it is not. The decisions of courts ought to be based upon such a degree of certainty as that the mind of a just judge should bo able to rest satisfied with the sentence. No judge can repose with confidence and rest his opinions upon the events of futurity. Events which have transpired, and not those to come, are, in the general, the sole aud exclusive subjects for the judiciary to act upon. The chancellor, by way of exception, may anticipate, and in some cases apply a preventive justice ; but cases of this character must be such as will leave the decree rendered, upon a permanent foundation; where its justice will not be influenced by the happening of future events, the one way or the other. The chancellor will, on fit occasions, undertake to control futurity, by decreeing that certain things shall not be done. Now, it is -impossible for us to say, that Richard Adams’ representatives will hereafter evict the defendants in error from the tvfm hundred and eighty acres of land. They may never institute a suit, or they may postpone suing until the title of the defendants may be protected by time. If this should be the course o.f things, it is clear that the covenant of warranty, entered into by the plaintiffs, will never be broken, and that the defendants will sustain no injury. Yet, in this case, where, to say the least, there is a possibility that the covenant may never be violated, a covenant entered into with good faith, and without the least intention to de *309 fraud, the court lias undertaken to annul, and thereby to destroy an executed contract. It is going unwarrantable lengths, in our- opinion. The consequence, in this particular case, has been, first, á declaration on the part of the court, that the Simpsons had no title to the estate ; and finally, a decree to sell whatever title they might have, to satisfy the sums awarded against them. It is not surprising, under these circumstances, that an estate which sold for near eight thousand dollars, should be ¡¡aerified for two hundred dollars.
Byt, he may ale timet, bring the whomheapprq-to'assert'or5^ lmquish their tiie'whole con-troverey settled A^d^ftheven-dor is insolvent* the CQ]lect,oa of the purchase mollef ,mN l36 suspended, in the mean time, mjunctioi>-Without
those-{^fte'dSyof the complainant tho^omt-there can he no relief., [^of'the'ch" Justice(concur-Nicholas T(d£. sentient,)posi.]
If the defendants had fears growing out of the insolvency of the Simpsons, and the situation of the title to the lands sold them, it might have been proper to apply to the chancellor to have those fears quieted. With that view they should have made the owners of the adverse claims parties, and called on them either to assert, or re-linguish, their claims. With these parties before the conrt, it would have put the future under the control of the chancellor, and laid such a foundation for a decree, as that its justice could not have been changed by any . '' a j j subsequent event.
The representatives of Richard Adams were made dc- , iendants, in the first instance ; but by consent oí both sides, they were not brought before the court, and the cause progressed to trial without their being parties. If they had been parties, and succeeded in asserting a better right to the two hundred and eighty acres, than that transferred by the Simpsons to Hawkins and Cochran, then the decree might have regarded Hawkins and Cochran same as in the situation, in respect to the two hundred and eighty acres, as they would have been in, had they been evicted by action of ejectment; and it might then have been proper to grant relief. The failure to bring the representatives of Adams before the court, is fatal to the equity claimed or asserted in the bill.
It should not be overlooked, that the defendants in error, as complainants, seeking relief against an executed contract, upon a warranty of title which had not been broken,were bound to do every thing 'necessary to make out the grounds upon which the chancellor could safely interpose in their behalf. For any thing that we know, *310 the representatives of Adams may have insisted on finning the contract and conveyance, made in the name of John Adams, as administrator,with the will annexed, by Steele as his attorney in fact. In that event, there could be no pretext for rescinding the contract between the plaintiffs and defendants.
The cases of Rawlins &c. vs. Trimberlake, 6 Mon. 225, and Payne vs. Cabell, 7 Mon. 198, sustain, we think, the principles of the foregoing opinion.
We are, therefore, of opinion, that the decree is altogether erroneous, and that the circuit court ought to have dismissed the bill, without prejudice, because of the failure of the' complainants to bring the proper parties before the court.
The relief granted by the court, is, we think, to say the least, premature, if granted at all in this case, it should be when it is shewn.that the defendants have suffered an eviction, or what shall be equivalent thereto. We think, that in cases like this, where the vendors are alleged to be insolvent, and there are just grounds for fearing an eviction, the chancellor may interpose, and suspend the payment of the purchase money, although the vendor has executed the contract on his part by a conveyance. But whenever he does, if there has been no eviction at law, we regard it as indispensable, that all parties interested should be brought before the court; when the chancellor should settle their respective rights-; and if in doing this, he finds it necessary to take the land from the vendee of the insolvent vendor, then he may secure the vendee, by setting off the damages occar-sioned by the loss of the land, against so much of the unpaid purchase money. This cause was not prepared under this view of the law.
The decree of the circuit court is reversed, and the cause remanded ; when the circuit court will either dismiss the bill, without prejudice, and dissolve the injunction, with damages ; or suffer the complainants to take steps to bring the proper parties before the court, as in its discretion, may best comport with the justice of the cause. The administrator of Hawkins is his proper representative, so far as the personalty is concerned, a,nd *311 s'bould be a party to the suit, if leave is given to make the proper parties. If leave is given to make the proper parties, the court will then take such other steps as may be necessary to bring the cause to trial on its merits.
May 10, 1833.
The power of tlie ohancelIor ty from appre-loiis (°!‘ a bill qtna ti-met) shouldne-tcT oppress11 or injure, another palN
Ante, p. 303.
The plaintiffs in error must recover their costs.
Before the close of the term at which the foregoing Opinion and Decision were rendered, they were suspended by order of court, and a reargument directed — to take place at the ensuing term. At the last Fall Term, the cause was. again argued at the bar, very elaborately, before the present Judges. Upon the final decision, at this term, the general principles of the former opinion again received the sanction of the court — Judge Nicholas dissenting upon the most material question. The views of the Judges respectively, will be seen by their separate Opinions which follow.
Judge Underwood
: — Since the reargument of this cause, I have given to it that attention which its importance to the parties litigant, and its effects in settling principles of law, required. The discussion which the subject has undergone, both at the bar and by the members of the court, has confirmed me in the belief that the opinion originally delivered, is correct.
As the record stands, Hawkins and Cochran have sustained no injury, and the Simpsons have not violated their covenant.
It is the apprehension of future injury, therefore, which constitutes the-basis of the bill.
It is the power which authorizes the chancellor to secure a party against future loss, that justifies him in taking cognisance of cases like this. Such power should never be exercised to the oppression and ruin of defend-T, ,. .. - , , , 1 , ants. Its limit should be the protection of the complainant against the apprehended danger or loss. In this case, it has not been used as a shield to save Hawkins and Cochran merely, but it has been employed as an instrument of destruction to the Simpsons. The original opinion exhibits my views as to the proper manner in which this extraordinary power of the chancellor should be used as a shield. I should deem it useless to add any thing to that opinion, but for a new attitude which this case may assume aftor its return to the circuit court.
Upon abill 5mm timet, if a party from whose title danger is apprehended,be a nonresident, to whom -he having failed to appear — the right to open the decree at any time within 7 years, is reserved, the vendor may be required to give security to indemnify the ven dee against loss, or he may be restrained from collecting the purchase money till the expiration of the 7 years.
íhe original opinion requires, that the complainants should shew, before they were entitled to relief, “an eviction, or what shall 'be equivalent thereto.” in other words, they must repose upon the warranty in the deed which they have accepted, until they shew a loss of the land by eviction under a paramount title, or that there exists a paramount title, which can and will be successfully asserted against them. And for this purpose, they are required to bring the holders of such adverse claims as they fear, before the court, and compel them either to relinquish, or assert, their claims, so that the power of the chancellor may be safely exercised. J regard it as immaterial whether the vendors had any title at all. If they conveyed with warranty, and put the vendee in possession, I hold that there can be no rescission of the contract where there has been no fraud, no eviction, and no assertion of an adverse claim.
The new aspect in which the case may present itself hereafter, is this :• Suppose the heirs of Adams are nonresidents, and consequently cannot be brought before the court to litigate their title, except by a constructive service of process : to wit, publication made against them. Suppose, under such publication, the court should decree a relinquishment of their title, in order to quiet the fears of the complainants. Then, as such decree is liable to be opened at any time within seven years — if it should be done, and the heirs of Adams successfully assert their claim, and deprive the complainants of the land, what will be the consequence if, in the mean time, they have paid the purchase money to their insolvent vendors ? The consequence would be inevitable loss, under such a. state of tilings. It is to prevent such consequences, that the power of the chancellor must be put forth. How shall it be done ? I answer in one of two ways, either by enjoining the collection of the purchase money until tiie seven years have run, and the decree has thereby become confirmed, or by permitting the vendors to give security, such as the court shall approve, to indemnify the vendees for paying over the money. In such a state of things, one or the other of these courses should be taken. If the vendors cannot give the security required, *313 the other course is safe ; and' the vendees cannot in that event complain, because they have, or might but for their fault, have had the use of the land.
Asimilar course may be pursued where the titles 01-8 feared,
By agreement eourttthineces-5% °f mak-™fnSaMe*par-keia'That the agreement oug.htv 11 “j, t0 by whom it was unprovt-dently made. Where, in a suit between ven-dees and vendors ofland, for a rescission Sfc. is afterwards re-tí decree has been rendered, and the land sold under the decree, which versed, and remanded, with leave to make new parties, who are alleged to hold a paramount title, the latter may, by cross bill, make the purchaser under the decree a defendant, have the whole matter settled, and obtain the possession. [See the concurrent opinion of the Chief Justice, and the dissent of Judge Nicholas, post.]
It may be asked, what is to be done, if one or more of the heirs of Adams are infants, and time should be reserv-edfor them to open the decree taken against them, un- ... . . ,‘ , ,, ,, . T , til six months alter their arrival at lull age? I would give the same answer. Either suspend the collection , . , ,. . , . _ of the judgments, or require the indemnity. It seems to me that such an exercise of the power of the chancellor will do full justice to all parties.
But if he be permitted to enquire, whether the deed with warranty passed a valid title, and if lie does not find it-entirely unexceptionable, then to cancel the contract, merely because the grantor is insolvent, it would, in my opinion, be tolerating a power to do mischief, and to aggravate the calamities which befal the poor. If there be fraud, there may be some foundation for such a doctrine. But if good faith and fair dealing has marked the conduct of the man who has since become insoL yent, I can never consent to deprive him of the advantages of an honest bargain, merely on account of his poverty. There is no fraud charged against the Simpsons, and it is evident to iny mind, from the whole record, that they acted in good faith.
As to the dismissal of the bill against Adams’ heirs, by .consent of the Simpsons, as well as the complainants, and waiving the necessity of bringing them before the court, I think it cannot operate against the rights of either party. It only proves that they have consented to an entry on the record, and acted in pursuance to it, so as to defeat the object both parties had in view. Now they are better advised, and an opportunity afforded them to correct the error.
What good will it do to make the heirs of Adams parties, when the land has been sold under the decree of the court ? Can they get possession if made parties, and *314 they should establish the best right ? I have no difficulty in answering these questions. The immediate benefit conferred by making them parties, is, that it will enable the court to settle the rights of all concerned, upon a solid foundation. They can obtain the possession, in this suit, in case they can establish the better right. Although they might have a complete remedy at law, still, if they are brought into chancery to litigate their right, they may make their answer a cross bill, and have complete justice done them. And to that end, they might make the person who purchased the land under the order of sale, a defendant. Such purchaser can occupy no better situation than the original litigants, and coming in under them may properly be reached by the chancellor, whenever it is necessary, to do complete justice.
DissEu-r of HIT ICH"
Stalemeiitofthe iase.
Judge Nicholas
: — In August, 1818, the Simpsons sold and conveyed by deed, with covenant of general warranty, to Hawkins and Cochran, a tract of land, containing five hundred and thirty acres, at the price of fifteen dollars per acre : t'he deed reciting that it “ embraced two hundred and fifty acres under Howard’s claim, and two hundred and eighty .acres conveyed by deed from William Steele, attorney in fact! for John Adams, to the Simpsons.”
Hawkins-and Cochran, having paid four thousand six hundred and seventy five dollars of the purchase money— in April, 1820, filed their bill, enjoining the collection of the balance, and praying a rescission of their contract of purchase from the Simpsons, on the ground that they had bought the land for the purpose of laying off a town upon it, trusting to the representations of the Simpsons, that they had a perfect title .to the land : Whereas, it had recently been discovered, that they had no title to two hundred and eighty acres of the tract.
The Simpsons answered; and without denying their representations of the goodness of their title, insisted that their title to the two hundred and eighty acres was good and perfect; that they derived title thereto by deed of conveyance from William Steele, attorney in fact of John Adams, administrator, with the will annexed, of *315 Richard Adams, deceased, who was the patentee of the land.
Deeree of tho court below,and sale of the land..
A high ■ price paid justifies the inference that the purchaser, ignorant of any defect of title, relied onthesel-ler’s representa;-tions.
in April, 1821, Hawkins and Cochran, by an amended bill, charged the Simpsons to be insolvent ; that the two hundred and fifty acres, residue of their purchase, was also covered by the patent to Richard Adams, and that the Simpsons had no title to that part either.
The Simpsons answer, that one of them settled on the two hundred and fifty acres in 1796, and had continued possession ever since ; that he originally settled by virtue of a bond from one Howard, whose claim was better than that of Adams, and, in 1818, had obtained a deed therefor from a Mrs. Ivy and her husband, she being the heir of Howard.
After two trips to this court, the cause came on for final hearing in 1828, the parties waiving, on the record, all objections on the ground that the heirs of Adams had not been brought before the court ; and the circuit court decreed a rescission of the contract; a restoration of the purchase money paid by Hawkins and Cochran, and ordered the land to be sold therefor. The Simpsons not having appealed, or superseded this decree, the land was sold by a commissioner, under the decree, and one Rigg became the purchaser, for the sum. of one hundred dob lars, with one of the Simpsons as his surety in the note ; and this sale was afterwards confirmed.
It is abundantly established, that the Simpsons are insolvent. The utmost value that can be put upon the whole five hundred and thirty acres, according to the proof, now, or at the time of sale, is not more than four thousand dollars; though Hawkins and Cochran agreed to pay seven thousand nine hundred and fifty dollars, and have actually paid four thousand six hundred and seventy five dollars therefor.. There is good reason, therefore, for believing, from the exorbitant price paid, and agreed to be paid — the uncontested allegations of Hawkins and Cochran, that they were ignorant at the time of the purchase, of any defect in the title, and that they trusted to the representations of the Simpsons, that thev had title.
Conveyance of land here, by a Virginia execu-title passes no
View of the plaintifl’s’ claim to the land, and conclusion that they were wholly destitute of title.
take a title bas-session!816^°S" Tiie chancellor will not compel a purchaser to
According to previous decisions, the grant in Virginia, of administration to John Adams, \yith tiie will annexed, conferred no power whatever upon liitn to sell land in this state ; any power, therefore, from him to William Steele, for such purpose, would have been a mere nulli-But }n truth,.though lie did authorize him bv let-J , ~ ter merely, to sell, he never did execute any power sum-dent to authorize him to convey. The sale and conveyance by Steele to the Simpsons, in 1818, did, therefore, give them no title whatever to the land.
They admit that the claim of Howard, under which they pretend to hold the two hundred and fifty acres, never has been patented, and entered in 1783, and surveyed in 1702, the survey never was returned to though suit. They do not prove any bond, or other executory contract, from Howard ; but exhibit a deed for the two hundred and fifty acres, from the daughter of Howard and her husband, to them, dated in 1818 ; but the deed never was acknowledged, nor the privy examination of the Jeme taken before any clerk, nor was it ever recorded. They do not even allege, that Howard himself ever made them any deed, or that his daughter ever made them any, other than the one exhibited. For the want of some such allegation, no presumption can be made of the execution of any such deed, even if it could otherwise have been allowed from the mere lapse of time. After eight years preparation, with a full knowledge of the necessity for proving .title, they have not been able to exhibit the least shadow of title, either legal or equitable, to any part of the land sold. It is true they shew, that at the time of the decree, they had had thirty years possession of part of it, that is of the two hundred and fifty acres ; but how much, of even that part, even is not proved ;— for it does not appear how much of that part was enclosed, what was the date of Adams’ patent, when Howard died, nor when his daughter married. But it does appear that Adams lived and died in Virginia, that his heirs are nonresidents, and that Howard’s daughter must have come ,to full a se within less than twenty years before the date ^le decree. What were the terms of the alleged *317 ■executory contract with Howard ; what was the purchase money, and whether it has been paid, are not even alleged. A title based exclusively upon a naked thirty years possession, held under such circumstances, is not such an one as the chancellor ought to compel a purchaser either to take or acquiesce in. This part of the case need not, however, be farther dwelt upon, inasmuch as I do not understand my brethren to contend, a sufficient title has been made out.
Of recitals deeds.
They contend, that, from the recitals in the deed to Hawkins and Cochran, they must be presumed to have had notice of the state of the title, and by accepting a deed they elected to risk the title, and trust to the covenant of warranty. Jn the first place, there are no allegations on the part of the Simpsons, to admit.either the presumption or proof of any such notice, in contradiction to the express denials of Hawkins and Cochran, and the strong inference to the contrary, deducibie from the high price paid, and the purpose lor which they made the purchase. But 1 do not understand the books as giving any such extensive effects to recitals in the deed. They only give notice of that which they recite. The only notice given by the recitals here, is, that the Simpsons held a part of the land under a deed from Steele, as attorney in fact for the administrator of Adams, and the balance under Howard’s claim. It is no notice of the insufficiency of Steele’s unrecorded power, or that the administrator had no power to sell, or that the Simpsons had no title, legal or equitable, derived from Howard. The utmost effect that could possibly be given to such recital, would be to fix them with notice of the whole chain of title to that part derived from Richard Adams. It cannot prove, that they had knowledge of the defect, or rather want of power, on the part of Steele and the administrator. The only fair presumption from the price paid, is, that they were ignorant of any such defect; supposed the title perfect, and trusted to the representations of the Simpsons, that it was so. The Simpsons do not pretend-that they made no such representations, or that the others knew of the defect of title ; on the contrary, their only reliance, in defence, is, that the *318 title is perfect and complete. The most favorable aspect in which the case can possibly be viewed for the Simpsons, is, that there was a mutual ignorance and mistake as to the title. This, it is true, is but ignorance of law on their part ; but still it is mistake of a material fact— the unsoundness of the title, though it be induced by ignorance of law. It seems to me, so radical a mistake, when connected with the actual misrepresentation,' should not be debarred from'all relief, merely because it proceeded from ignorance of law, when it is admitted the mistake was mutual, and any other supposition makes the vendor guilty of a fraud. But taken in connection with the insolvency of the vendors, the mistake, the misrepresentation, and the want of title, constitute a state of case fully authorizing the decree of the circuit court.
Purchaser in pos session under a warranty deed, may enjoin the collection of the •purchase money, by the vendor who is insolvent without title.
t£.ueslion-whe-ther the true owner of land 'can be compelled to become a party to the suit of others, who claim, Sf contend with each other for, the land.
It is too late now, in this court, to question the doctrine, that where a vendee has received a conveyance with warranty, and been let into possession, he may nevertheless enjoin'the collection of the purchase money? when the vendor becomes insolvent, and it turns out that he has no title, or that his title is defective. That doctrine has been incidentally and directly recognised in too many cases to he now shaken, even if it were originally wrong. But it is right in itself, and clearly deducible from the general principle that sustains every injunction guia timet. The dispute is, therefore, narrowed down to the enquiry, whether it be the duty of the vendee, in such cases, to make the holder of the title a party; compel him to assert and litigate his right wifh the vendor, or be barred by a decree compelling a release.
There is a previous question, whether the proprietor, or title holder, can be properly coerced into such litigation, by either vendor or vendee. If A be in the possession of land belonging to B, there is no pretence for his maintaining a bill, shewing that fact, for the purpose of compelling B, cither to assert liis title and turn A out, or surrender it to A — the latter having no claim whatever thereto, either legal or equitable. Nor can the fact, that A innocently purchased from C, supposing he had title, alter the case. Neither would A and C both uniting in a bill against B, alter it. They could maintain no such *319 bill against him. Nor can the matter be altered, so far as concerns B, that A and C should have got into a dispute with each other, concerning his property, to which neither of them has any just claim whatever. Suppose, however, that B is made a party to such litigation, and he,makes default: would any chancellor decree a surrender of his title to property, confessedly his, because they had wrongfully usurped the possession, or because they were disputing with each other as to the validity of a sale of it from one to the other ? The twenty ninth section of the act of 1796, 1 Dig. 221, is an enabling sta--tutc, which, for the first time, authorized the holder of both the legal title and possession of land, to quiet his possession, by bill in equity against any person setting up title thereto. Without this statute he could not have clone it, but was compelled to wait until the adversary claimant chose to assert his title. With how little pretext then, can such right be claimed in behalf, of one having barely the possession, without title, either legal or equitable?
Qvestion-as to which of two contending parties is bound to bring before the court, a' third, whose title one claims' under, by defective con veyanee, y the other fears will be asserted against both.
But if the true proprietor can thus be compelled to litigate his title with, or surrender it to, persons having no right, whose duty is it to bring him before the court, in this case ? Strictly speaking it is the duty of neither, unless he chooses so to do. The complainants shew, that they are about to have the purchase money collected from them by their insolvent warrantors. Here their case is fully made out. The danger of the proprietors hereafter asserting their claim, and the complainants being left, after collection of the purchase money, without any adequate recourse, fully authorizes an injunction against the collection. If the defendants had defaulted, without making any answer, the injunction must have been perpetuated. If they had answered, admitting the title to be in the devisees of Adams, but saying they made no claim to the property, and never intended to assert it, would such mere naked asseveration, without proof, induce the chancellor to dissolve the injunction ? This, however, is not the ground of reliance. The defendants insist and rely that they have the title. It seems to be conceded, that the ground referred to, even if it were relied on, can only be sufficiently and satisfactorily made- *320 out, by bringing the deviees of Adams before the court. Now it would appear to be in the natural order of things, that he who relies on a defence, should assume the bur-^ien °*' making out that defence. The presumption of j>eril and the. actual peril to the complainants, is the same now, that it was at the institution of the suit. If the want of title was good ground for granting the injunction, it must be equally available for perpetuating it. If the bill had merely alleged, the defendants had no title, and they had admitted it, but, by way of avoidance, had said, the title was in a third person who nevqr meant to assert it, that could not have rendered it the duty of the complainants to have amended their bill, and brought such third person before the court, to ascertain whether what the defendants had said with regard to his intention were true, or no. See Hogan vs. McMurtry, 5 Mon. 183.
It is said, that there is a chance, the proprietors of this land may never assert their claim, and in that event, i^ would be doing wrong, as between these parties, to rescind their contract. But on the other hand, is there not a chance, and a much greater one, that they will assert and enforce it ? in which event, it will have been doing still greater injustice, not to have perpetuated the injunction. This chance of injustice is much the least on the side of the party in default, and they should be made to bear the burthen. Besides, there is no room for conjecture here ; for it is proved, that, since the institution of the suit, one of the heirs of Adams, was in the neighborhood of the land, disavowing the validity of the sales made by Steele, asserting the claim of his father’s heirs ; and that the Simpsons were., chaffering with him for a relinquishment of their title. In these cases, the injunction should never be dissolved until the purchaser is secured against risk from the want of title in the vendor. The vendee stands very much in the attitude he does when defendant, resisting a specific performance ; and it is probably speaking within bounds, to say his injunction should never bé dissolved, except under similar circumstances to those where specific performance would be enforced against him. That is, where the title is freed from all danger.
upon -..'inch the “llai>ce!lor “>■- terposes m favor of the ven-Jafdiuríofti-tie.
'It Is further said, “ no judge can repose with confidence, and rest his opinions, upon the events of futurity. Events that have transpired, and not those to come, are, in the general, the sole and exclusive subjects for the judiciary to act upon.”. Admitting all this, still its direct application is not distinctly perceived. In granting the purchaser relief, the chancellor acts upon no undivulged ©r untransnired event. He restrains the collection of the 1 . purchase money because of the peni m which the purchaser would otherwise be placed, from the want or imperfection of title in the vendor. The want of title, and insolvency of the vendor, are ascertained facts-; the peril to the purchaser thence ensuing is an existing evil, which the vendor is bound to remove, before he can equitably and conscientiously proceed to the collection of the purchase money. This is not acting upon a state of case that may arise, but upon one that already actually exists, it is not a remedy for breach of warranty, or any thing equivalent or similar thereto. But an act of “preventive justice,” on the part of the court, the full effectuation of which, under a due attention to the interest of both parties, requires a rescission of the contract. It is a mere exception to the general rule, that after taking a conveyance, the purchaser will not be allowed to rescind for the want or defect of title- As to the uncollected purchase money, it places the purchaser in nearly the same attitude, as if the conveyance had not been executed. A perpetual injunction, or, at least, for so long as the purchaser is in danger, is what his case requires, and all that it requires. But as it would be unjust for him to withhold the purchase money, and continue the enjoyment of the land, in which there is a chance he may never be disturbed, the interest of the vendor requires the court to go a step farther, rescind the contract, and make the purchaser restore the title and possession. The right to the injunction does not depend upon any actual or virtual eviction ; but proceeds from the manifest injustice it would be to permit the insolvent warrantor to collect the purchase money, whilst the purchaser was in danger of being evicted. In effectuating this right, the rescission ensues for the benefit of the warrantor himself,
■-- «aiustheira who Rave received moneyjoftheh-land, sold by one not duly authorized.
it js surmised, that the proceeds of sale to the Simpsons, may have been appropriated to the benefit of the devisees of Adams; and it is thence inferred, that the c^ance^or might prevent them from asserting their claim. The obvious answer to which, is, that if there be any su'ch state of case it should have been shewn, and not left to mere conjecture. If, however, the facts be conceded, it is more than doubted whether any such result would follow. The most the chancellor could do, in such case, . , , would be, to make the devisees refund to the bimpsons, or their vendees, the amount they had received. This was only two hundred and fifty dollars, for three hundred acres of the land; which would be but poor re-numeration to the purchasers here, for two hundred and eighty acres, at fifteen dollars per acre. But the chancel- • lor cannot act upon, nor can he rightfully compel the purchasers to rely upon,any such unstable surmise of either law or fact.
It is presumable, from what appears in the record, that the devisees of Adams are non-residents, and that they will have to be brought before the court by advertisement. Suppose it be done in that way ; that they make default, as it is likely they will, and that though no shadow of right be manifested for divesting them of their title to the land, yet the court decrees a surrender* and release of it: would the court compel the purchasers io rest with such title, so obtained, and dissolve their injunction, when it would be in the power of the devisees, at any time within seven years, to open the decree, and set aside the whole proceeding ? A doubt is intimated in Tenis vs. Richardson, 7 Mon. 657, whether the court should, in any case, compel a purchaser to accept a title derived through a proceeding against unknown heirs. There are still stronger reasons for not compelling him to accept it under circumstances like these, where the bnly ground of equity against the non-resident defendants, is, the unsnstained affirmation, that they never mean to assert their right.
If the case of the defendants could have been aided by bringing the devisees of Adams before the court, it was their duty to have made them defendants, and by *323 appropriate allegation and prayer, have enabled the court, on final hearing, to have quieted and confirmed the title of the complainants, by proper decree. They had abundant time for so doing and if not, it would have been granted, on application. Having failed to do it, they should abide the result af their own laches.
Of the effect.of a waiver of the want of objection of necessary parties, and the sale of property under a decree in such case.
But there is, to mv mind, an unanswerable objection to reversing the decree, because the heirs of Adams are not brought before the court, to be found in the fact, that the parties mutually waived the benefit of any such objection. The Simpsons by failing to appeal, or supersede the decree, suffered the property to be sold and purchased, under the decree, by a third person, for a mere trifle. If the doctrine of the case of Anderson's heirs vs. Parker's heirs, 5 Mon. 451, is to prevail, and that purchaser hold the property, notwithstanding the reversal of the decree, it will present a case of peculiar hardship to Hawkins and Cochran. They have already paid the Simpsons the full value of the land ; it is now irreclaim-ably transferred from them to the purchaser, and unless' they can induce the true owners to come before the court, and in this suit successfully assert their claim to the property, notwithstanding the five years of additional possession that have intervened since the decree, the injunction will bo dissolved, and Hawkins and Cochran made to pay, in principal, interest, damages and improvcments3 at least double the value of the property, in addition to what they have already pa.id. But what are Adams’ heirs to get by it, if they do submit to have their rights litigated in this suit ? The possession has no doubt long since, gone, with the title of the Simpsons, to the purchaser under the decree. If they assert and establish the superi--ority of their title, the chancellor cannot give them possession. Will he dismiss them, without affording them any relief? Or will he have the purchaser under his decree, who- he is bound to protect, brought before the court, to litigate the question of title with Adams’ heirs, and thereby put him in peril, at the instance, or for the sake, of those who no longer have any interest in the property ? It seems to me that this would be not only á perversion, but a gross abuse of his powers.
Cxi. Jus. Robertson’s O-VINION.
'Statement of the case.
Tbe case of Morrison vs. Beckwith, 4 Mon. 73, will be found to have no application to, or analogy with, this-. There the purchaser did not, as here, seek a rescission of the contract on account of defect of title and the insolvency of his vendor; but merely an injunction against the collection of the balance of the purchase money, on account of a small sum still due on a stale mortgage, which embraced not only the small lot purchased by Beckwith, but other estate of the value of some hundreds of thousands, of dollars. The court properly said he was not entitled to a perpetuation of his injunction,without awakening the old mortgage, and bringing the proper parties before the court, for the purpose of having it satisfied, either out of the balance of his purchase money, or by ratable contribution among the property holders. The attitude in which Beckwith stood towards the mortgagor, mortgagee and other purchasers, authorized him to bring them all before the court, and it was indispensable he should do so, to entitle himself to the only relief sought, a perpetuation of his injunction. Here, neither of the parties have a right to bring the true proprietors, of the property before the court, for there is neither pri-vity of estate or contract among them, and it is not at all necessary to the relief sought by the purchasers here —that is, a rescission of the contract..
Chief Justice BobeetsüN
: — As my associates have considered it proper to give their opinions seriatim in this case, I will (though I see nothing in it which entiles it to such a distinction,) briefly and separately, present an outline of my opinion.
In the year 1800, Richard Adams of Virginia, published his last will, and died. Among other things, he ' directed his executors to sell a tract of land, which he-claimed, on the Kentucky river, not far above its mouth, and containing about twenty thousand acres. The executors having refused to qualify, John Adams was appointed, (in Virginia,) administrator, with the will annexed ; and, in 1807, gave a power of attorney to Col. William Steele, of Kentucky, to sell all, or any part of the land claimed by the testator on the Kentucky river. In June, *325 1818, Steele sold, and (in the name of John Adams, as administrator, with the will annexed,) conveyed to Walter C. Simpson and James Simpson, two hundred and eighty acres, of the twenty thousand acre tract, for the consideration of two hundred and fifty dollars. In August, ISIS, Walter C. Simpson, James Simpson and Greenberry Simpson, for the consideration of seven thousand nine hundred and fifty dollars, part paid in hand, and the residue secured by bonds, sold and con. veyed to William Cochran and John T. Hawkins, five hundred and thirty acres of land — “ embracing (as the deed recites,) two hundred and fifty acres under Howard's claim, and (the) two hundred and eighty conveyed by deed, by William Steele, attorney in fact for John Jidams, to James Simpson and Walter. C. Simpson, on the 11th of June, 1818.”
Howard’s claim is covered by Adams’ twenty thous- and acres; and, though it appears to have been regularly entered and surveyed, no grant, as may be inferred, had ever been obtained for it. But the Simpsons and those under whom they claimed had been in the uninterrupted possession of the two hundred and fifty acres, under Howard’s claim, and adverse to that of Adams, ever since the year 1796.
In 1820, Cochran and Hawkins filed a bill in chancery, to enjoin two judgments for a part of the consideration, and to obtain a rescission of the contract, on the ground, that John Adams had no authority, as administrator, cum testamento, to sell and.convey the two hundred and eighty acres. In 1821, they filed an amended bill, alleging that Howard’s title had never been perfected, and suggesting, also, a belief, that the Simpsons would not be able to indemnify them for a loss of the land, which they apprehended (as they averred,) to be a probable contingency.
The answers insist, that Cochran and Hawkins were fully apprised of the nature of the titles when they purchased the land ; that there is no cause for apprehending an eviction, or disturbance, by Adams’ heirs ; that the' only object of the bill was to get clear of a speculation, which had not proved profitable, and that the vendors *326 arc able to make good any breach of their warranty, if there shall ever be an eviction.
Decree of the circuit court, fy its-effects.
After so years quiet possessions of adverse daims should not be indulged. A grant may be presumed when vey, and thirty y.ears P0SSC3“
The circuit court perpetuated the injunction to the judgments; rescinded the, contract, and subjected the land to sale, for the amount which had been paid. The land was accordingly sold, and was bought by one Rigg, for the sum of one hundred dollars. The court approved the sale, and thereupon, decreed against the Simpsons three thousand four hundred and twenty nine dollars, forty seven and a half cents, with legal interest thereon, from the 11th , of August, 1818. Under a fieri facias on that decree, the right of redemption was sold for one hundred dollars, and w'as purchased by Rigg-
■ This writ of error is prosecuted to reverse that decree.
Such a decree cannot be just. If it be permitted to stand, the appellants, without fraud on their part, will have been deprived of their contract, and of the five hundred and thirty acres of land, for the sum of two hundred dollars, although the appellees have never been evicted or disturbed, in their possession, and have not shewn, that it is even probable that they will ever be evicted.
There is no proof of fraud, or of a misrepresentation of any fad, by the appellants ; nevertheless, their executed contract has been rescinded, on the assumed ground, that they had no title; and still, after deciding that they had no right, any potential or contingent right which could or might have been in them, was sold by the decree ! And thus it is not surprising, that the price which was bid, was so small.
As to U1C two hundred and fifty acres included in-Howards survey, there is no reason to apprehend an eviction. An adverse possession of thirty years is a satisfactory assurance, especially as no conflicting claim lias , . , , 1 / , . , -c been assorted. Anda grant which may, it necessary, yet ;je obtained (as wc presume,) 'would inure to the benefit of the appellees. Indeed a grant may be presumed from the lapse of time, combined with a possession which amounted, at the date of the decree, to more than thirty years; and, as the register has certified the survey, I will not presume that it was not made ip time, *327 more especially as there has not been even an intimation to that effect.
A conveyance of land in this state, by a foreign executor, passes no title. Ante, 306,8X6.
The grantee is presumedto understand the circumstances of the title, so far as they are indicated by recitals in the deed he receives• hence the presumption that he was to risque the title, andrely on his warranty. [Judge Nicholas of a different opinion, ante, 317.]
Where land was sold in pursuance of a power given by will, but by a conveyance defective and void, the heirs of the testator having long acquiesced, and probably re ceived the proceeds, the presumption is,that they will never set up any claim -that they could do so successfully, is not certain. [SeeJudge Nicholas’s remarks on this point, —-■ ante, 322.]
There is a technical defect in the title to the two hundred and eighty acres. The administrator, with the will annexed, had no legal power to convey the title, unless he liad been qualified as administrator in Kentucky, and liad thus acquired a right to convey, by the lex loci rei scitm. But the facts were known, or must be presumed to have been known, by the appellees, at the date of the deed to them. It iccts their duty to look into the documents of title, and their deed itself recites the fact, that their vendors derived all their right from a conveyance hy the attorney in fact of the administrator, vjith the ivill annexed. The legal presumption, from these facts, is, that they had fall knowledge of the nature and effect of the title. See Payne vs. Cabell, 7 Mon. 202, and Rawlins et al. vs. Timberlake, 6 Ib. 233. And the presumption, also, necessarily follows, that they agreed to risk the title, and rely only on the warranty. See 1 Johnson's Chy. Rep. 213, and 2 Ibid. 519. This view applies to both tracts. The deed recites that the plaintiffs derived claim from Howard.
As the will authorized the sale of the land, and especially as the lapse of time and other circumstances indicate an acquiescence by the heirs and devisees of the testator, and a distribution of the proceeds of the sale among them, we may presume that,were they hereafter to assert a title to the land, they might be estopped in a court of equity. As the only objection which could be made to the sale, is, not that the will did not authorize it, but that the administrator, with the will annexed, did not qualify as such in this state, I am disposed to think that, in equity, the sale could be enforced. See Kent's Com. on Principal and Agent, and Paley on Agency. But, however this might bo, as no new-discovery as to the title has been made, and as it is such, and such only, as it was, and appeared to be, at the date of the deed, in August, 1818, no cause appears which will, according to any authority, or principle of equity, with which I am acquainted, or which I have ever seen, authorize a decree for rescinding the contract, for defect of title to the two hundred and eighty acres. And it seems to me very clear, that the alleged defect in *328 (|le title to the two hundred and fifty acres, cannot justify a rescission. As to that tract, there seems .tobe no danger, or just cause even of apprehension.
bcn'din"3 aPfoss yfthe land, and warrantor to in-domnii'y them, should bring the parties from whose title the hended, before sort'o^diselaim tlieirright.[«á«-ins.f09 If3<the vendors aresol-remedy is upon the warranty. .Unte, 305.
-As then there had been no eviction, or fraud, why should the contract be rescinded ? If the plaintiffs in error were insolvent, and the defendants really apprehend-ec^ an eviction, they might have filed their bill quia timet, and enjoined the judgments, until they could ascertain, by bringing Adams’ heirs before the court, whether they would, or could, assert any claim successfully, or would „ , ,, , , J confirm the sale made by the personal representative. That was the utmost of their equity. If the plaintiffs were able to indemnify the defendants for an eventual ev'cti°n) even an injunction would not have been allowable. The only remedy would, in that event, have been a su't on the warranty. The insolvency of the plaintiffs has not been proved in such a manner as to leave no doubt whether they woukl be able to indemnify the defendants for the loss of the two hundred and eighty acres, worth . , , , , comparatively little — that is, about, faity cents an acre. But let it be admitted, that they are hopelessly insolvent: what more had the defendants a right to ask than a suspension of any further payment, until further and satisfactory assurance of title ? There may have been a .mutual misapprehension as to the legal power of the administrator to sell the land. But were that admitted, or had it been proved, it could not have affected the question of rescission, because it was a mistake as to the law, and not as to the fact.
Before the defendants should have maintained an injunction, and required further assurance, they should not only have shewn reasonable ground for apprehension of irreparable loss, but should have sought a satisfactory assurance of title. The only allowable object of their bill, was to enjoin the judgments until they should be secured, and until the court should be able to dispose of the case in such a manner as would be just and safe to all persons concerned. But the defendants did not ask for further assurance ; .they did not make Adams’ heirs parties ; they did not even suggest, that they were in new danger of eviction or disturbance; or that there was a *329 probability that Adams’ heirs would ever attempt to evict them, or that they could ultimately succeed, should such an attempt ever be made. But, though in peaceable possession, under an -executed conveyance, with warranty, and though there is no proof of fraud, or misrepresentation of any material fact, the defendants sought, at ' once, a rescission of the contract, without asking further assurance, or shewing any wish to obtain it, or making any effort to bring about a confirmation, or an eviction.
It is the duty oC the vendees who allege, that there is a paramount; titie, on account of which they claim a rescission of the contract, to bring the holders of. such title before the court— JLnte, .309.
[Judge Nicho--las dissents on this point: ante, 319.]
Without fraud or misrepresentation, the plaintiffs were not bound to make further assurance, or to litigate (as to the title,) with Adams’ heirs. It was not, therefore, their duty to make those heirs parties. But it was the duty of the defendants to have made them parties before they should have enjoined the judgments ; because, otherwise, they could not shew, that they are entitled either to a rescission of the contract, or to a perpetuation of their injunction. Upon- such a bill quia timet, the complaining parties should bring before the court the persons from whom they apprehend danger, in order to shew the nature and extent of that danger, and to be secured against it, if it actually exist. And unless they manifest a disposition, and make proper efforts to ascertain and settle whatever may jeopard their title, or disturb their peace, they do not present themselves acceptably to the chancellor. Do they really apprehend, that Adams’ heirs, or any person who may claim under Howard, will ever evict or disturb them ? Let them call on those persons, either to assert, or to waive, their claims, and the chancellor may enjoin the judgments, until the issue as to title shall be satisfactorily settled. And then, if it should be ascertained, that the title of the defendants in error is secured, their injunction should be dissolved ; but if they should be evicted, actually or virtually, the injunction should be perpetuated, according to the extent of that eviction. Or if, without making other parties, the plaintiffs in error choose to secure an indemnity for any eventual loss which the defendants may sustain, in consequence of a defect of title, the injunction might be discharged. See Morrison’s administrators et al. vs. Beckwith, 4 Monroe, 77.
The sale of an estate under a decree in chancery does not effect the right of one (not party to the suit,) who held a title paramount to that of him whose title was sold under the decree. Ante, 313. [See Judge Nicholas on this ■point;cmie,323.
The case just referred to, also shews, that, to entitle a party in such a case as this, even to an injunction, he should bring before the court all those whose claims he may fear. And why should he not ? He desires a suspension of the payment until he can ascertain whether he ought, in equity, to make payment. Should he not then proceed without delay, to employ the proper means for ascertaining whether the danger which he wishes to avoid really exists, and to have it removed, if it do, in fact, exist? He should not have his injunction perpetuated, unless he shall lose the land, or a part of it, and therefore he should proceed in such manner as to enable the court, upon ascertained facts, and without injustice, either to dissolve, or perpetuate, the injunction. A perpetuation of the injunction without an eviction would be manifestly unjust ; because, in that event, a party' might keep both the land and the consideration. As then there was no fraud, or misrepresentation of any fact respecting the title, and as the defendants in error knew, or should be presumed to have known, the nature of the title derived by the plaintiffs from Howard and from Adams, and accepted a conveyance, relying upon the warranty of title — the plaintiffs are not bound to litigate as to the title, unless the defendants will allege that they apprehend an eviction, ancl will ask for an investigation of title, and will, for that purpose, make the proper parties for finally' adjusting all controversy. This not only seems to me to be obviously right and equitable, but to have been virtually settled by this court, in Morrison vs. Beckwith, supra.
But it is said that, (perhaps,) Rigg may hold the land, in consequence of his purchase under the decree. Of that I should have no apprehension. But were it conceded that he might hold the land, the concession would not change the attitude of the parties. If the defendants im-' properly procured an erroneous decree for selling the land, and had it sold, so as to divest them of their claim to it, the plaintiffs should not thereby be deprived of their equitable rights, nor perpetually enjoined from enforcing their judgments, unless the defendants can shew such a case as will authorize a, perpetuation of the injunc- *331 tlon. This they cannot do without shewing that their title never could have been perfected ; which cannot be made to appear, unless those whose claims may be feared, be made parties, and shall successfully assert title. Adams’ heirs will not be affected by the sale under the decree. And the court, having possession of the case, might, should it be deemed necessary or expedient, bring Rigg before it, in the event of Adams’ heirs asserting title, and thus finally settle the whole controversy. Ij; never can be settled satisfactorily or justly in any other: way.

Mandate.

Mandate.
it is decreed by the court, (Judge Underwood concurring, and Judge Nicholas dissenting,) that the decree of the circuit court, be reversed and the cause reminded, with instructions to allow a reasonable time to amend the bill, and make other parties ; and unless, within a reasonable time, such amendment be made, to dismiss the bill without prejudice. But, in the mean time, to maintain the injunction ; and if the bill be properly amended, then to render such a final decree as the new and ultimate aspect of 'the case may render just and equitable-, according to the opinion of this court.